[No. B093696. Second Dist., Div. Two. Sept. 9, 1997.]

TOM VU et al., Plaintiffs and Appellants, v.
CALIFORNIA COMMERCE CLUB, INC. et al., Defendants and
Respondents.

COUNSEL

Fred L. Wright for Plaintiffs and Appellants.

Bird, Marella, Boxer, Wolpert & Matz, Joel E. Boxer and Thomas R. Freeman for Defendants and Respondents.

Robie & Matthai and Pamela E. Dunn as Amici Curiae on behalf of Defendants and Respondents.

OPINION

FUKUTO, J.—Plaintiffs Tom Vu and Mansour Matloubi appeal from summary judgment in favor of defendants California Commerce Club, Inc. (the club), and Huong Mai, in an action to recover money plaintiffs lost while playing card games at the club, assertedly as a result of cheating. We affirm.

FACTS

The club provides facilities for card games legal in the City of Commerce, including two that plaintiffs played, "Asian stud" poker and "Pan-Nine."[1] Betting at the club is only among the players; the club provides the facility, cards, chips, and dealers, and receives a fee per hand from each player. The club maintains a security network that includes video cameras and individual "spotters."

Plaintiff Vu played Asian stud and Pan-Nine at the club between July 1991 and July 1993. During that period, he allegedly lost approximately $1.4 million. Plaintiff Matloubi, a professional poker player, played the two games between May 15 and May 29, 1993, during which he allegedly lost approximately $120,000. These losses constitute plaintiffs' claimed damages.

The cheating that plaintiffs asserted included the following. First, certain Asian stud players played as "partners," signaling to each other their hole cards and betting accordingly. These players originally were employed by the club to get games started; after that practice ended, some of them returned to play again. Second, defendant Mai, a manager in the Asian stud

---

[1]Asian stud is a variant of five-card stud; players are dealt five cards, four face up and one "in the hole." Only a 32-card deck is used, cards numbered 2 through 6 being removed. In Pan-Nine, cards are dealt from a shoe containing 12 decks, excluding cards with values 7 through 10; the object is to accumulate a hand as close to 9 as possible.

games, gave vocal and hand signals to players whose play he funded (also to field competitors for other players). Third, marked cards occasionally were used in the poker games.[2]

Plaintiffs' primary theory of liability was that there had existed an implied contract between themselves and the club, entered into by plaintiffs' joining in the games and paying the club's fees, whereby the club impliedly promised to provide adequate security, including investigation of cheating, to insure that the games were honestly played. Plaintiffs alleged that the club had breached these contractual obligations, and that plaintiffs had thereby suffered their above-described gambling losses through cheating.

Plaintiffs also asserted causes of action for conversion, and conspiracy to convert, against the club and certain employees and players (not parties to this appeal), based on the alleged cheating. Plaintiffs subsequently recharacterized the conversion charges as involving the club's retaining of funds confiscated from Pan-Nine games in which the club detected cheating, as well as Mai's alleged coaching of players.

After demurrers had been sustained without leave as to certain other causes of action, the club moved for summary judgment.[3] The club argued, inter alia, that plaintiffs could not as a matter of law prove that they had been damaged by the club's alleged misconduct. With respect to the conversion claims, the club further urged that plaintiffs could not establish that the club converted any specific sums from them.

In response to the motion, plaintiffs offered little direct evidence that they had encountered the alleged cheating in their play at the club, and no such evidence that cheating had been the cause of their losses. One player declared that Mai had sponsored other players to play with Vu, and that on numerous occasions, not necessarily involving Vu, Mai had made hand and voice signals. Another player stated that he had seen marked cards in use at the Asian stud games on 45 to 50 occasions in which he and Vu played at the same table, and on which occasions Vu had lost. Matloubi declared that on May 29, 1993, he had been the victim of partnering. Holding a pair of jacks, he had bet against raises by a player showing a 10, but had lost the game to another player with two kings, one in the hole. Matloubi had concluded that the raising player had been assisting the winner, against whom Matloubi would not have continued to bet. At deposition, Vu admitted that he did not know whether his losses at the club were attributable to cheating, bad luck, or better players.

[2]The evidence of these practices that plaintiffs offered was largely hearsay. However, the trial court did not specifically rule on the club's individual objections.
[3]Mai joined in the motion.

The court granted the motion for summary judgment on several grounds, but also granted leave to file an amended complaint alleging a cause of action for breach of the implied covenant of good faith and fair dealing. Plaintiffs' amendment alleged a "unilateral contract" with the club, essentially identical to the implied contract previously alleged, and further charged that the club's allowance of cheating violated the implied covenant. Plaintiffs again prayed for their gambling losses. The court sustained defendants' demurrer to this cause of action without leave to amend, and judgment followed.

## Discussion

■ We first consider plaintiffs' contract causes of action, for breach of implied contract and thereafter for breach of the covenant of good faith and fair dealing in a similar, so-called unilateral contract.[4] An essential element of these claims was damages resulting from the breaches of contract. Plaintiffs' allegations and theory were that the club's failure to fulfill its implied promises of security from cheating enabled plaintiffs' competitors to cheat, which in turn caused plaintiffs' losses. That premise, however, was untenable as a matter of law.

Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain. (Civ. Code, §§ 3300, 3301.) No such certainty or probability appertains with respect to plaintiffs' gambling losses, assertedly the result of cheating. Assuming arguendo that an adequate causal connection could be established between the club's alleged breach of security obligations and the cheating that plaintiffs allegedly encountered, no such relationship appears between the cheating and plaintiffs' losses. That is because winning or losing at card games is inherently the product of other factors, namely individual skill and fortune or luck. It simply cannot be said with reasonable certainty that the intervention of cheating such as here alleged was the cause of a losing hand, and certainly not of two weeks' or two years' net losses (as alleged by Matloubi and Vu respectively).

In an analogous case, the Supreme Court recognized that the probability of winning a horse race was too speculative, as a matter of law, to permit assertion of a claim for damages based on interference with that expectation.

---

[4]Plaintiffs actually did not allege a unilateral contract. Such a contract entails an exchange of performance for a promise. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 14, pp. 48-49.) Like its predecessors, plaintiffs' amended pleading alleged no express promises, only implied ones.

In *Youst* v. *Longo* (1987) 43 Cal.3d 64 [233 Cal.Rptr. 294, 729 P.2d 728], the owner of a racehorse entered in a Hollywood Park event sued the driver of another horse who had allegedly interfered with plaintiff's, seeking damages equivalent to the higher purse plaintiff would have won absent the interference. The Supreme Court upheld the sustaining of a demurrer to plaintiff's claim for interference with prospective advantage, because "to allow recovery without proof of probable loss would essentially eliminate the tort's element of causation, which links the wrongful act with the damages suffered." (*Id.* at p. 74.)

The court explained: "Determining the probable expectancy of winning a *sporting* contest but for the defendant's interference seems impossible in most if not all cases, including the instant case. Sports generally involve the application of various unique or unpredictable skills and techniques, together with instances of luck or chance occurring. at different times during the event, any one of which factors can drastically change the event's outcome." (*Youst* v. *Longo*, *supra*, 43 Cal.3d at pp. 75-76.) Accordingly, the court "conclude[d], as a matter of law, that the threshold element of probability for interference with prospective economic advantage was not met by the facts alleged, whether or not some 'conspiracy' between a competitor and non-competitor existed. It was not reasonably *probable*, on the facts alleged, that [plaintiff's horse] would have finished in a better position. Indeed, we may take judicial notice of the impossibility of predicting such matters . . . ." (*Id.* at p. 77.)

The foregoing considerations apply equally to plaintiffs' claims with respect to their gambling losses. Plaintiff Vu himself expressly disavowed being able to reckon whether his losses had resulted from the alleged cheating, from the superior play of competitors, or from bad luck. And plaintiff Matloubi characterized Pan-Nine as involving 100 percent luck. The unpredictability of the outcome of these games is of the same quality that the court recognized with respect to horse racing in *Youst* v. *Longo*, *supra*, 43 Cal.3d 64, placing such contests outside the range of probabilities necessary for proof of actionable damages.[5]

Plaintiffs' efforts at distinguishing *Youst* v. *Longo*, *supra*, 43 Cal.3d 64, lack basis. There is no distinction, practically or legally, between the claim there for damages that the plaintiff would have won and plaintiffs' present

---

[5]A concurring opinion in *Youst* v. *Longo*, *supra*, 43 Cal.3d 64, opined that some horse racing outcomes might not be too speculative to support a claim for damages resulting from interference—"e.g., a horse shot just before it crosses the finish line, 10 lengths ahead of the field." (*Id.* at p. 84 (conc. opn. of Grodin, J.).) Conceivably, similar extreme cases might be hypothesized with respect to poker and Pan-Nine. But plaintiffs did not allege frustration of any such outcomes.

claim for damages for what they lost. Both claims are based on speculation that the given game or event would have turned out more favorably than it did. Indeed, in the card games involved in this case, losing is synonymous with not winning.

Plaintiffs urge us to follow *Berman v. Riverside Casino Corporation* (9th Cir. 1963) 323 F.2d 977, which held that a casino patron who alleged he had lost because the defendant used loaded dice could sue for his losses. That case, however, applied Nevada law, as derived from English law, and addressed only the issue of whether suit was barred by the in pari delicto doctrine. Plaintiffs' case is controlled by a different issue, under California law.

· ■ The trial court also properly granted summary judgment on the causes of action for conversion and conspiracy to commit it. The subject of these causes of action, and the damages alleged in them, once again were the funds plaintiffs lost. But neither by pleading nor responsive proof did plaintiffs identify any specific, identifiable sums that the club took from them. That rendered the generalized claim for money not actionable as conversion. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 614, p. 710.) Indeed, the gist of plaintiffs' case was that much of the money they lost was taken by persons other than the club or its employees. Any amounts the club may have taken (e.g., Pan-Nine bets confiscated upon discovery of cheating) also were not identified.

■ Plaintiffs finally assign error in the sustaining without leave to amend of the club's demurrer to a negligence cause of action alleged in plaintiffs' first amended complaint. In response to that demurrer, plaintiffs conceded that their claim, as pleaded, was an insufficient one for negligent misrepresentation, but they requested leave to amend to "allege a proper cause of action for negligence." Plaintiffs now contend that the pleading contained the basic elements of a "premises liability" cause of action, and that in any event it could have been amended to state a negligence claim, either on that theory or on the basis of negligence per se, based on various City of Commerce ordinances regulating card club gaming.

Whatever the merits or demerits of plaintiffs' assertions of duty, the hypothetical cause of action for negligence was fatally deficient in the necessary element of causation of damage. Plaintiffs once more would assign responsibility to the club for all of their gambling losses, on the premise that the club's failure to live up to duties of security and integrity caused those losses, through the cheating that it enabled or failed to prevent. For the reasons discussed in connection with plaintiffs' contract causes of

action, the premise of causation was speculative as a matter of law. Accordingly, failure to allow assertion of the negligence claim cannot be deemed prejudicial error.

## DISPOSITION

The judgment is affirmed.

Boren, P. J., and Zebrowski, J., concurred.

A petition for a rehearing was denied October 7, 1997.