**TRUSTEES OF THE SOUTHERN CALIFORNIA PIPE TRADES HEALTH AND WELFARE TRUST FUND, et al., Plaintiffs,**

v.

**TEMECULA MECHANICAL, INC., and Patrick Leonard, Defendants.**

No. EDCV 06 238 SGL.

United States District Court, C.D. California.

July 3, 2006.

Marija Kristich Decker, Laquer Urban Clifford & Hodge, Pasadena, CA, for Trustees of the Southern California Pipe Trades Health and Welfare Trust Fund, Trustees of the Southern California Pipe Trades Retirement Trust Fund, Trustees of the Southern California Pipe Trades Defined Contribution Trust Fund, Trustees of the Southern California Pipe Trades Vacation and Holiday Trust Fund, Trustees of the Southern California Pipe Trades Christmas Bonus Fund, Trustees of the Apprentice and Journeyman Training Trust Fund, Trustees of the Plumbers and Pipefitters National Pension Fund, Trustees of the International Training Fund, Plaintiffs.

Christopher S. Milligan, Atkinson Andelson Loya Ruud and Romo, Thomas W. Kovacich, Atkinson Andelson Loya Ruud & Romo, Cerritos, CA, for Temecula Mechanical Inc a California corporation, Patrick Leonard an individual, Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

LARSON, District Judge.

This case brings into sharp focus the liability limits under the Employee Retirement Income Security Act of 1974 ("ERISA") for unpaid employer contributions to employee benefit funds established through a multi-employer plan. Plaintiffs are the trustees ("Trustees") for seven employee benefit funds ("Funds") established under a multi-employer collective bargaining agreement ("CBA") for the benefit of Southern California unionized plumbers. The Trustees have filed a five-count complaint against defendants Temecula Mechanical, Inc. ("TMI"), and its president and sole owner, Patrick Leonard, for monies allegedly owed the Funds in the form of delinquent contributions and union dues. Three of the claims in the complaint are the focus of the present motion to dismiss brought by defendants: Breach of fiduciary duty and engaging in a prohibited transaction by failing to make contribution payments to the Funds in violation of ERISA, *see* 29 U.S.C. §§ 1104(a), 1106(b)(1), and a state law conversion claim for the unremitted union dues. For the reasons set forth below, the Court **GRANTS** in part and **DENIES** in part the motion to dismiss.

### I. Rule 12(b)(6) Standard

When a party moves to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all the material allegations contained in the complaint and must also construe those allegations in the light most favorable to the plaintiff. *See Sanders v. Kennedy,* 794 F.2d 478, 481 (9th Cir.1986).

When judging the allegations in the complaint, a court is not confined solely to what is contained in the complaint itself. A court may also "consider ... material which [was] properly submitted as part of the complaint." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1989). Moreover, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered ...." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994). In that regard, the Court has before it several documents whose contents are made reference to in the complaint even if they are not physically attached to it: The CBA and the Trust Agreements for each of the seven benefit funds. While defendants initially raised foundational objections to the manner in which those Trust Agreements were proffered by the Trustees, those objections were satisfied through the subsequent submission by the Trustees of a declaration by a person who has first-hand knowledge of the documents in question, the administrator for the local trust funds and CEO for a entity that handles unpaid contributions for the national trusts. *See Orr v. Bank of America, NT & SA*, 285 F.3d 764, 777 (9th Cir.2002); 5 WEINSTEIN'S FEDERAL EVIDENCE § 901.03[2], at 901–22 (2nd ed.2006).

## II. Factual Background

The Funds provide the financing for various benefits to union plumbers working in Southern California as a multi-employer benefit plan within the meaning of ERISA. (Compl.¶ 1). The Funds are jointly administered labor-management trust funds established in CBAs negotiated between the Southern California Pipe Trades District Council No. 16 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry ("District Council No. 16") and various employer associations in the plumbing and pipefitting industry in Southern California in accordance with the Labor Management Relations Act. (Compl.¶¶ 2, 5). The dispute regarding the unpaid employer contributions owed to the Funds arises out of the obligations set forth in the CBA between TMI and District Council No. 16.

Leonard operated a plumbing and pipefitting contracting outfit doing business as TMI. (Compl.¶ 7). In or about January, 2000, Leonard incorporated TMI and the company voluntarily assumed all of the assets and all of the liabilities of Leonard's business. (Compl.¶ 9). A few months prior to incorporating his business, Leonard signed a copy of the existing Master CBA then in effect between Southern California Contractors and District Council No. 16. (Compl. ¶ 9; Decl. Patrick Leonard, Ex. A at 39). The Master CBA required Leonard to make certain monthly contributions (the amount based on a particular monetary rate keyed to the number of hours worked by union members at the employer's work site during that month) to several trust funds. (Decl. Patrick Leonard, Ex. A). Upon its creation TMI assumed identical duties. (Compl.¶ 9).

The Trustees allege that TMI failed to provide contributions required by the Master CBA for the period January 1, 2002, through June 30, 2003, and that the amount of these unpaid contributions was $291,279.50, which with interest totals over $300,000 presently allegedly owed by defendants to the Funds. (Compl.¶¶ 17, 22). Furthermore, the Trustees allege that, during the same time period, defendants failed to remit union dues to the Funds "in an amount presently unknown." (Compl.¶¶ 58, 60).

TMI ceased to be a party to the Master CBA after July 1, 2003, when it refused to sign an extension of the Master CBA for that year. (Compl.¶ 9).

## III. ANALYSIS

### A. *ERISA claims*

ERISA provides that "a fiduciary shall discharge his duties with respect to a plan ... with the care, skill, prudence, and diligence ... that a prudent man ... would use." 29 U.S.C. § 1104(a)(1)(B). Here, the Trustees allege that defendants are plan fiduciaries and that they breached various duties owed by a fiduciary or that they (as fiduciaries) engaged in various prohibited transactions. The relevant specific duties are that a fiduciary shall ensure that "assets of a plan ... never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan," 29 U.S.C. § 1103(c)(1), and "shall discharge his duties with respect to a plan solely in the interests of the participants." 29 U.S.C. § 1104(a)(1). Similarly, fiduciaries are barred from using "plan assets" in any transaction with "a party in interest," 29 U.S.C. § 1106(a)(1), or deal with plan assets "in his own interest or for his own account," 29 U.S.C. § 1106(b)(1), or "transfer to, or use by or for the benefit of, a party in interest, any assets of the plan." 29 U.S.C. § 1106(b)(1)(D). The statute then provides that "any person who is a fiduciary" and who breaches his fiduciary obligations or otherwise engages in prohibited transactions "shall be personally liable to make good to such plan any losses to the plan ... and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a).

■ The Trustees allege that these fiduciary obligations were breached by defendants and that, as fiduciaries, they engaged in prohibited transactions by misusing the unpaid contributions "either [by] diverting the contributions to [Leonard's] sole and exclusive benefit and/or diverting the contributions to [TMI's] sole and exclusive benefit and their indirect benefit." (Compl.¶¶ 10, 41, 50). Defendants raise two points of law in response to these ERISA claims. First, they press that neither defendant is liable on either claim because unpaid employer contributions are not plan assets, a pre-requisite for the existence of a fiduciary duty or a claim based on prohibited transactions under ERISA.[1] Next, defendants argue that, even if the unpaid employer contributions are plan assets, the Trustees cannot hold Leonard personally liable for the same in the absence of some showing that he was either the alter ego of TMI or that TMI's corporate veil should otherwise be pierced. The Court will address each point in turn.

---

1. The complaint alleges that some, but not all, of the unpaid contributions at issue in this case were comprised of "monies funded exclusively by deductions from covered *employees*' compensation." (Compl. ¶ 36 (emphasis added)). Department of Labor regulations make clear that unpaid *employee* contributions are considered plan assets. *See* 29 C.F.R. § 2510.3–102(a) ("the assets of the plan include amounts (other than union dues) that a participant ... pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution to the plan"). Two of the Funds in this case— the 401K Fund and Vacation Fund—are com-

prised of employee contributions. (Pls' Opp. at 7). Therefore, insofar as defendants argue that the employee contributions made to these two Funds are not plan assets, their argument is foreclosed by the applicable regulation. *See Nelson v. EG & G Energy Measurements Group, Inc.,* 37 F.3d 1384, 1391 (9th Cir. 1994) (holding that in light of 29 C.F.R. 2501.3–102(a) "the employee contributions should have been considered plan assets at the time they could reasonably have been segregated"). However, even absent this regulation, defendants' argument as applied to these two Funds fails for the reasons set forth in the body of this Order.

### 1. *Are Unpaid Employer Contributions Plan Assets?*

■ Under ERISA, a person is considered a plan fiduciary if, among other things, "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). "This definition requires (1) showing that the plan assets are at issue and (2) that the individual defendants exercised authority or control relating to the management or disposition of such assets." *NYSA–ILA Medical & Clinical Serv. Fund v. Catucci*, 60 F.Supp.2d 194, 200 (S.D.N.Y.1999). The question in this case is whether TMI or Leonard are fiduciaries for purposes of ERISA.

The Trustees begin by noting the statute's definition for a plan fiduciary and then emphasize the second part of the definition, arguing that both defendants directed monies that were owed to the Funds and used them for other purposes, thereby making them liable as a plan fiduciary. (Compl. ¶¶ 10, 41, 50; Pls' Opp. at 4–6). This argument, however, presupposes that unpaid employer contributions are fund assets.[2] As one court noted, "because a fiduciary is one who exercises authority over the management or disposi-

tion of plan 'assets,' a defendant's fiduciary status in cases concerning delinquent contributions often turns on whether the term 'assets' includes such delinquent contributions." *Trustees of the Nat'l Elevator Pension Funds v. Lutyk*, 140 F.Supp.2d 407, 410 (E.D.Pa.2001); *see also Catucci*, 60 F.Supp.2d at 200 (noting that the first question to be resolved is "the question of whether the monies allegedly in the defendant's control were 'Fund assets' ").

The term "assets" is nowhere defined in the statute. Rather, the term's meaning is supplied by reference to case law. Towards that end, defendants argue that the Ninth Circuit answered this precise question in the negative in *Cline v. Industrial Maint. Eng'g & Contracting Co.*, 200 F.3d 1223 (9th Cir.2000). There the court stated:

> Until the employer pays the employer contributions over to the plan, the contributions do not become plan assets over which fiduciaries of the plan have a fiduciary obligation.

*Id.* at 1234; *see also Collins v. Pension and Ins. Comm. of the Southern California Rock Prods. and Ready Mixed Concrete Ass'ns*, 144 F.3d 1279, 1282 (9th Cir. 1998) (observing that "[a]lthough ERISA does not explicitly define 'plan assets,' a plain interpretation of the term does not encompass future contributions not yet made").[3] Defendants submit that this rul-

---

**2.** Whether the unpaid employer contributions are plan assets is also determinative of whether defendants can be liable for engaging in prohibited transactions. *See* 29 U.S.C. § 1106(b)(1), (3) (prohibiting self-dealing with "assets of the plan"); *Cline*, 200 F.3d at 1234 (noting that no basis for "prohibited transaction claim because no 'plan assets' are involved").

**3.** At least two courts have gone the other way, holding that the statutory term "assets" admits inclusion of future employer contributions. *See In re Luna*, 406 F.3d 1192, 1199–1200 (10th Cir.2005) (holding that unpaid employer contributions are assets of the plan in

that such unpaid obligations give rise to "a *future interest* in the collection of the contractually-owed contributions" that is akin to a presently-existing "chose in action"; therefore, "although the plan does not possess the unpaid contributions themselves, it does possess the contractual right to collect them" and that contractual right "is an 'asset' under ERISA"); *United States v. LaBarbara*, 129 F.3d 81, 88 (2nd Cir.1997) ("Once wages were paid to Local 66 members, [the employer] had contractual obligations to the Funds that constituted 'assets' of the Funds by any common definition. Certainly, an audit of the Funds would have to include such fixed obligations as assets").

ing precludes the ERISA claims in question as a plan fiduciary cannot control sums of money, and thus cannot breach a fiduciary duty regarding the same, which are not yet paid to and in control of the plan. At first blush there is much appeal to defendants' argument. The court's statement in *Cline* is sweeping and all-encompassing; until the money is paid out by the employer to the plan, it is not an asset of the plan. The Trustees counter that a peek beneath the court's written opinion would reveal that the Ninth Circuit in *Cline* merely stated the *general* rule regarding unpaid employer contributions, leaving unaddressed a commonly applied exception when the plan document itself identifies unpaid employer contributions as a plan asset. The Trustees' argument is not based on any subsequent statement from the Ninth Circuit refining or explicating the point made in *Cline,* which is not surprising given that there has been no statement from the Ninth Circuit or any district court in this circuit on this point since *Cline.*

To begin, it is clear that a number of courts from outside the Ninth Circuit have applied such an exception to the rule pronounced in *Cline. See Lutyk,* 140 F.Supp.2d at 410; *Catucci,* 60 F.Supp.2d at 200–01; *Connors v. Paybra Mining Co.,* 807 F.Supp. 1242, 1246 (S.D.W.V.1992); *Galgay v. Gangloff,* 677 F.Supp. 295, 301 (M.D.Pa.1987). Those cases have noted that the legal proposition, like the one set forth in *Cline,* is the "general rule," but that this rule gives way in the face of language in the plan document identifying unpaid employer contributions as plan assets. *See Lutyk,* 140 F.Supp.2d at 410–11(collecting cases); *see also Catucci,* 60 F.Supp.2d at 200–01 ("When an employer's contribution becomes an 'asset' of a plan must be determined by reference to the rights and obligations created by the underlying wage agreement"). The question thus squarely presented by this case is whether the rule set forth in *Cline* is as conclusive as that pressed by defendants, or whether it would admit the refinement made by courts outside this circuit. The Court concludes that the latter is the better of the two views of *Cline's* holding.

In support of its proposition, *Cline* (as well as the Ninth Circuit's earlier decision in *Collins*) cited to an opinion from the Eleventh Circuit, *Local Union 2134, United Mine Workers v. Powhatan Fuel, Inc.,* 828 F.2d 710, 714 (11th Cir.1987), which held that "until monies were paid by the corporation to the plan there were no assets in the plan under the provisions of ERISA." The sentiment expressed in the Eleventh Circuit opinion is as broad and seemingly all-encompassing as that expressed in *Cline.* Despite this fact, the Eleventh Circuit later held that its apparently unequivocal broad statement in *Powhatan Fuel* admitted the exception now pressed by the Trustees in this case:

> The text of ERISA does not give a relevant definition for what constitutes an "asset" of an ERISA fund. The proper rule, developed by caselaw, is that unpaid employer contributions are not assets of a fund unless the agreement between the fund and the employer specifically and clearly declares otherwise. The effect of language that makes unpaid contributions assets of the fund is that "when a corporation is delinquent in its contributions, the fund has a sufficient priority on the corporation's available resources that individuals controlling corporate resources are controlling fund assets." This effect places "heavy responsibilities on employers, but only to the extent that ... an employer freely accepts those responsibilities in collective bargaining."

*ITPE Pension Fund v. Hall,* 334 F.3d 1011, 1013–14 (11th Cir.2003). As far as reconciling this statement with its earlier

preclusive proposition in *Powhatan Fuel,* the Eleventh Circuit noted: *"Powhatan* does not stand for the proposition that unpaid employer contributions are *never* assets of an ERISA plan until those contributions are actually paid into the plan. Our decision in *Powhatan* concerned the general rule, that unpaid employer contributions are not assets of an ERISA plan, and we had no occasion to consider in that case the effect of contrary plan language, which, as we have stated, is the exception to the rule." *Hall,* 334 F.3d at 1013–14 n. 2 (emphasis in original).

Following the Eleventh Circuit's lead, the Trustees in this case similarly argue that it would be wrong to presume that the Ninth Circuit in *Cline* sought to reject the majority of other courts who allow for the plan language exception, especially when the Ninth Circuit did not have the opportunity to employ the exception to the general rule in the case before it.

Their argument is persuasive. It is clear to the Court that various plan documents were before the Ninth Circuit to review in *Cline. See* 200 F.3d at 1232 ("Appellants contend that Appellees presented only the CBA. This contention overlooks the Group Individual Retirement Annuity Policy which had been presented without opposition to the court"). What is unclear is whether anything in those plan documents would have raised the prospect of applying the exception to the general rule now at issue. If not, it would not have been unusual for the court to simply recite the general rule in ruling against the plaintiffs and leave it at that. That the court in *Cline* did not discuss the plan terms is not surprising when a review of the parties' briefs in that case demonstrates that the point was not pressed by either side.[4]

The appellees in *Cline* did press as a means of relieving them from liability for application of the general rule that unpaid contributions are not plan assets:

> Employer contributions do not become "plan assets" under ERISA until the employer actually transfers payment to the plan: Although ERISA does not explicitly define "plan assets," a plain interpretation of the term does not encompass future contributions not yet made. *Collins v. Pension & Ins. Cmte.,* 144 F.3d 1279, 1282 (9th Cir.1998). Therefore, the withholding of contributions does not involve a fiduciary function or constitute a fiduciary breach. *Local Union 2134, United Mine Workers v. Powhatan Fuel, Inc.,* 828 F.2d 710, 714 (11th Cir.1987); *Young v. West Coast Indus. Relations Ass'n,* 763 F.Supp. 64, 75 (D.Del.1991), aff'd, 961 F.2d 1570 (3d Cir.1992); *Galgay v. Gangloff,* 677 F.Supp. 295, 301 (M.D.Pa.1987).

---

4. It is also clear that even the general rule was not pressed by the parties in *Collins.* Rather, the court in *Collins* on its own made reference to *Powhatan* as a means to rebut appellant's argument that a breach of fiduciary duty always occurs under ERISA when an employer, faced with an overfunded benefit plan, lowers its contribution levels to the plan and uses the difference for its own use. *See* Appellants' Opening Br., 1996 WL 33490546, at *16 (July 18, 1996) (characterizing appellees' action as to foreswear "using the increased investment value of the plan assets for the benefit of the participants, [but instead] ... convert[ing] the accrued assets to their own use by decreasing their contributions to the Plan"). This argument necessarily presumed that the contributions that were not made to the plan constituted a "fail[ure] to invest plan assets." *Id.* In rejecting this proposition, the Ninth Circuit simply held that under ERISA, contributions not made to the plan are not plan assets and, hence, no ERISA violation could occur. Significantly, in making this decision, no reference to the plan documents was made by either side or by the court. Instead, the court in *Collins* employed the general rule that the term "plan assets" as used in ERISA does not encompass unpaid contributions and left it at that.

Appellees' Joint Answering Br., 1999 WL 33648951, at * 32 (March 22, 1999). Interestingly, some of the very cases cited to by the appellees in *Cline* not only set forth the general rule, but also note and then apply the exception to that rule. *See Young v. West Coast Indus. Relations Ass'n*, 763 F.Supp. 64, 75 (D.Del.1991); *Galgay*, 677 F.Supp. at 301. The appellants in *Cline* responded to this line of argument, but also without making reference to the exception to the general rule:

> Appellees also assert that TIMEC's decision to unilaterally withhold contributions is not a fiduciary act because those payments were not plan assets. (JAB pp. 31–32) This argument fails, for as we have shown, the entire plan is not just the contract with the Great West, because the entire plan is created by the collective bargaining agreement with provisions which nullify the attempted individual retirement annuity status.

> In any case, the Department of Labor has established a specific regulation determining when such contributions must be paid. 29 C.F.R. § 2510:3–102, (Applicable to participant contributions). As TIMEC placed all "plan contributions into a suspense account" (ER 207), TIMEC has held plan assets as defined by the Department of Labor in the breach of its fiduciary duties [FN11] See, IT Corp. v. General American Life Insurance Co., supra, (discretionary control over cash creates fiduciary status). FN11. Appellees are correct that the status of employer contributions as opposed to employee contributions is less clear. (JAB 31–32) This Court need not reach that issue because it is plain that employee contributions were also withheld.

Appellants' Reply Br., 1999 WL 33648969, at *21 (May 17, 1999).

As the parties in *Cline* did not press for the exception, it is unremarkable that the Ninth Circuit failed to note or address it, leaving instead for it to apply the general rule to the issue before it. Accordingly, the Court finds that the statement in *Cline* does not preclude application of the exception now pressed by the Trustees.

■ To apply the exception here, the Court must look to the Trust Agreements to determine whether unpaid employer contributions are considered "assets" of the Funds. In section 2 (entitled, "Composition of Trust Fund") to Article II to six of the seven Trust Agreements it provides that "[t]he assets of this Trust Fund consist of (1) the sums of money that have been or will be paid or which are due and owing to the Fund by the Employers as required by Collective Bargaining Agreements . . . [and] (5) all other Contributions and payments to or due and owing to the Trustees from any source to the extent permitted by law . . . ." (Decl. Milton D. Johnson, Exs. A–F). This language in the Trust Agreements makes clear that the monies composing the Fund *include* those that are "due and owing" from "Employers" and "any [other] source." TMI's debt to the Funds, as money owed to the same by an employer, is therefore a fund "asset." The same "due and owing" language used in the Trust Agreements has been held by a number of courts as sufficient to identify unpaid employer contributions as assets of the plan. *See Lutyk*, 140 F.Supp.2d at 410–11; *Catucci*, 60 F.Supp.2d at 200–01; *United States v. Panepinto*, 818 F.Supp. 48, 51 (E.D.N.Y. 1993); *Paybra Mining*, 807 F.Supp. at 1246; *Galgay*, 677 F.Supp. at 300–01.

■ The last Trust Agreement—the one involving the Plumbers and Pipefitters National Pension Fund—uses slightly different language in section 2 to Article II to describe the composition of the Fund, indicating that the "assets" of the Fund include "such sums of money as have been

or shall be paid to the Pension Fund by the Employers." (Decl. Milton D. Johnson, Ex. G at 216). Use of the word "shall" conveys a future or as of yet unpaid obligation owed by a signatory employer to the Fund. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1075–76 (10th ed.1999) (defining "shall" to mean "will have to: Must"; "used to express what is inevitable or seems likely to happen in the future"; "used to express simple futurity"). Other courts have similarly considered the use of the phrase "shall be paid" as sufficient to evince an intent to include unpaid employer contributions as plan assets. *See Lutyk*, 140 F.Supp.2d at 411 (determining that unpaid contributions were likely plan assets where the trust agreement stated that the "Trust Fund shall consist of . . . such sums of money as shall be paid to [the plan] by the Employers").

Defendants contest the above analysis of the language in the Trust Agreements by disputing the applicability of the Trust Agreements submitted by the Trustees in connection with the current motion to dismiss.

■ First, defendants note that the Trust Agreements submitted in conjunction with the declaration "were signed in March, 2001," nearly two years after Leonard is alleged to have signed the existing Master CBA. It is argued that the language in these Trust Agreements cannot be used against defendants to prove that unpaid contributions are plan assets as they "could not have been incorporated into the" Master CBA signed by Leonard. (Defs' Suppl. Br. at 2).

The language in the Master CBA refutes this argument. Section 28.3 of the Master CBA signed by Leonard authorized the Employer-designated Trustee "to act on his behalf pursuant to" the terms of the Trust Agreement. Each of the Trust Agreements, in turn, contain a provision granting the Employer Trustees the au-

thority to amend the Trust Agreements and bind the signatory Employer to those amendments. (Decl. Milton D. Johnson, Ex. A, Art. XI §§ 1–3; Ex. B, Art. XI §§ 1–3; Ex. C, Art. XI §§ 1–3; Ex. D, Art. XI §§ 1–3; Ex. E, Art XI §§ 1–3; Ex. F, Art XI §§ 1–2; Ex. G, Art XI §§ 1–2). The fact that the Trust Agreements in question date from two years after Leonard signed the Master CBA therefore is of no moment as those amendments to the Trust Agreements were specifically authorized by defendants through their designated Employer Trustee.

Second, defendants argue that two of the Funds—Christmas Bonus Fund and the International Training Fund—were not referenced in the Master CBA signed by Leonard and therefore the Trustees for those Funds lack standing to assert the claims against them. (Defs' Suppl. Br. at 4). A closer look at the Master CBA reveals the fallacy of defendants' argument. The Trust Agreement for the Christmas Bonus Fund, formerly known as the Retired Members Supplement Trust Fund, is specifically mentioned in section 28.2 of the Master CBA as being incorporated into it. Moreover, the wage and fringe benefits rate sheet attached to the Master CBA clearly de-marks the "Retiree Christmas Fund" as a fund to which contributions were owed by the signatory employer. Insofar as the International Training Fund is concerned, that too was identified in the wages and fringe benefits rate sheet contained in the Master CBA as a fund to which a signatory employer owed contributions.

Defendants further complain that consulting language in the plan documents is a "futile" and "counter-intuitive" exercise as it ignores the business reality that money is fungible and cannot, in any logical sense, be considered as belonging to anyone until and unless the employer pays it out. That may well be true and, indeed, it is that

very understanding of how the real world operates that is sought to be captured by the general rule that unpaid employer contributions are not plan assets. That said, the Court will not turn a blind eye to how the parties themselves have structured the realities of their business relationship through the Master CBA and related plan documents they have negotiated. As the court in *Catucci* observed:

> An agreement that unpaid debts to an ERISA fund become fund assets means that when a corporation is delinquent in its contributions, the fund has a sufficient priority on the corporation's available resources that individuals controlling corporate resources are controlling fund assets. Such agreements may place heavy responsibilities on employers, but only to the extent that, as here, an employer freely accepts those responsibilities in collective bargaining.

> . . . . .

> Such violations may seem difficult to avoid when the corporation is in debt to the Fund because virtually any bills the corporation pays may be deemed uses of Fund assets. That is what the corporation and its controlling persons bargained for, however, when they agreed that unpaid contributions be deemed Fund assets. A ruling otherwise would improperly rewrite a collective bargaining agreement in a way that deprives one party, the Fund, of a useful debt collection procedure that the other party—the employer and its privies, agents, and controlling persons—freely agreed upon in a bargaining process that balanced both sides' benefits and detriments.

*Id.* at 201, 203.

Given that the parties themselves defined unpaid employer contributions as plan assets under the terms of the Trust Agreements they negotiated, the Court will hold them to the same.

### 2. *Are Corporate Officers Personally Liable Under Section 1109?*

Defendant Leonard argues that, even if the exception to the general rule set forth in *Cline* is applicable in this Circuit, and even if the parties' Trust Agreements identify unpaid employer contributions as fund assets, he still cannot be held personally liable for the ERISA claims brought against him—breach of fiduciary duty and engaging in a prohibited transaction—absent a piercing of the corporate veil or a showing that he was the alter ego for TMI. Leonard argues that for there to be a valid fiduciary duty or prohibited transaction claim brought against corporate officers and directors, an added and unstated statutory requirement applies: For liability to attach to them they must not only fall within the statutory definition of a fiduciary, but the corporate edifice behind which they act must be dismantled. The rationale behind this argument is that to hold otherwise would confuse fiduciary acts with those simply done on behalf of the corporation. Stated another way, so long as the individual officer or director's acts are done within the corporate form, *i.e.*, in their role as officer or director (something akin to "official capacity" in a section 1983 civil rights claim), then those acts are not chargeable against the individual officer or director but against the corporation itself; absent a piercing of the corporate veil then the individual officer or director cannot be held as a plan fiduciary. This argument was rejected long ago by the Ninth Circuit.

 A plan fiduciary includes not only those named as fiduciaries in the plan documents but anyone else who exercises discretionary control or authority respecting the plan's management or disposition of its assets. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251, 113 S.Ct. 2063, 124 L.Ed.2d

161 (1993); *see also* 29 U.S.C. §§ 1002(21)(A). ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms" of control and authority over the management or disposition of plan assets, "thus expanding the universe of persons subject to fiduciary duties-and to damages-under" section 1109. *Mertens*, 508 U.S. at 262, 113 S.Ct. 2063. This functional approach emphasizes that the acts or responsibilities, not the job title or whether they performed those acts on someone else's behalf, controls whether fiduciary liability exists. "[A] person's actions, not the official designation of his role, determine[s] whether he enjoys fiduciary status." *Acosta v. Pacific Enterprises*, 950 F.2d 611, 618 (9th Cir.1991). Reinforcing this view of how fiduciary liability is predicated is a Department of Labor bulletin answering questions regarding as to when and under what circumstances a person is considered a plan fiduciary.

D–3Q: Does a person automatically become a fiduciary with respect to a plan by reason of holding certain positions in the administration of such plans?

A: Some offices or positions of an employee benefit plan by their very nature require persons who hold them to perform one or more of the functions described in section [1002](21)(A) of the Act.... Persons who hold such positions will therefore be fiduciaries.

Other offices and positions should be examined to determine whether they involve the performance of any of the functions described in section [1002](21)(A) of the Act.

29 C.F.R. § 2509.75–8. The bulletin then goes on to apply this same reasoning to determining personal liability as a fiduciary for corporate officers and directors: "Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section [1002](21)(A)." *Id.* at D–4.

Based on this functional approach to imposing fiduciary liability, both as reflected in the statute and the regulations promulgated thereunder, the Ninth Circuit has long held that corporate officers can be personally liable as fiduciaries based solely on "their conduct and authority with respect to ERISA plans" even if that same conduct was done on behalf of the corporate entity itself. *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1459 (9th Cir.1995); *see also IT Corp. v. General American Life Ins. Co.*, 107 F.3d 1415, 1420–22 (9th Cir.1997); *Parker v. Bain*, 68 F.3d 1131, 1140 (9th Cir.1995); *Yeseta v. Baima*, 837 F.2d 380, 386 (9th Cir.1988).

■ As noted earlier, section 1002(21)(A) of ERISA defines a fiduciary as anyone who "exercises any authority or control respecting management or disposition of [plan] assets," or "has any discretionary authority or discretionary responsibility in the administration of such plan." Such a definition includes anyone, an individual, a corporation, *etc.*, who has discretionary authority over the management of the plan or its assets. Thus, whether Leonard is personally liable for a breach of fiduciary duty turns not on whether TMI's corporate veil can be pierced, but instead on whether Leonard himself exercised any "discretionary authority" regarding the management or disposition of unpaid contributions (a plan asset, as discussed above).

■ To that end, the complaint alleges that Leonard is "responsible for the day-to-day operations of [TMI] and [is] responsible for all, or a majority of, the decisions pertaining to the payment of contributions to the Trusts, including decisions a) whether or not to pay such contributions, b) if payment is to be made, when to pay such

contributions and c) how to use such contribution funds pending payment to the Trusts." (Compl.¶ 37). In essence, the complaint provides that Leonard had the primary (if not sole) responsibility in determining whether to pay contributions, when those payments were made, and if not what to do with those unpaid contributions. Such allegations are more than sufficient to demonstrate that Leonard exercised authority or control over plan assets, and hence is a fiduciary for purposes of imposing personal liability under ERISA. *See IT Corp.*, 107 F.3d at 1421 (" 'Any' control over disposition of plan money makes the person who has the control a fiduciary"); *Patelco Credit Union v. Sahni*, 262 F.3d 897, 909 (9th Cir.2001) (same); *Yeseta*, 837 F.2d at 386 (employee who, at the direction of company principals, withdrew plan assets and placed those assets in the company's account to pay "necessary operating expenses" held as "exercis[ing] control over and dispos[ing] of Plan assets").

Leonard's argument that the Ninth Circuit decision in *Operating Engineers Pension Trust v. Reed*, 726 F.2d 513 (9th Cir.1984), is somehow to the contrary is misplaced. In that case, the trust fund sought to hold the sole owner of a corporation liable for unpaid contributions under section 1145 to ERISA, which was added as part of the Multi–Employer Pension Plan Amendments Act of 1980. *Id.* at 514. That provision provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collective bargaining agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. "Employer" is defined for purposes of section 1145 as "any *per-son* acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5)(emphasis added). ERISA defines a "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9). Central to the Ninth Circuit's holding in *Operating Engineers* that a corporate officer could not be held personally liable for a section 1145 violation absent a piercing of the corporate veil was the omission of corporate officers or directors from the lengthy and broad statutory definition for "employer":

> The trust agreement applies only to 'employers.' Upon incorporation Reed ceased to be the employer, and Hal's Crane Co. became the employer in question. Hal's Crane Co. alone should, absent special circumstances, be responsible for the unpaid contributions after it became the employer.

> . . . . .

> Instead, "[t]he proper standard for determining when an individual will be held personally liable for the trust fund obligations of a corporation controlled by that individual is set forth in *Audit Services, Inc. v. Rolfson*, 641 F.2d 757, 764 (9th Cir.1981). An owner of a corporation will be held personally liable for trust fund contributions if (1) there is little or no respect shown to the separate identity of the corporation; (2) recognition of the corporation as a separate entity would result in injustice to the litigants; and, (3) there was a fraudulent intent behind the incorporation."

*Operating Eng'rs*, 726 F.2d at 515.

Here, however, liability is predicated upon an entirely different section of the

statute—section 1109. The Trustees' ERISA claims against Leonard are not for a violation of section 1145 (which they have brought in their second cause of action solely against TMI). Rather, Leonard is listed as a defendant with respect to the breach of fiduciary duty and prohibited transactions claims. It is to those statutory provisions that the Court must confine its consideration, and those statutory sections, as previously discussed, premise the liability of a "person" (which the statutory definition includes as "individuals") upon those who have discretionary control or authority over the management and disposition of plan assets, which, as alleged in the complaint, Leonard clearly does.

### B. *Conversion claim*

Defendants assert that the Trustees' state law claim for conversion of unpaid union dues is barred as the Trustees do not have standing to make such a claim, it fails to meet the specificity requirement, and, in any event, the claim is pre-empted under ERISA. The preemption argument has intuitive appeal, but ultimately is lacking in merit. If the Trustees were seeking to recover losses suffered by the Funds based upon a common law theory of conversion, undoubtedly ERISA would preempt the claim as it would be nothing more than an alternative theory of recovery for conduct actionable under ERISA. The Trustees' conversion claim, however, does not seek to recover unpaid contributions to the Funds themselves. Rather, the conversion claim is premised upon defendants' failure to tender to the unions the withheld dues. The Trustees argue that union dues are not plan assets by pointing to a Department of Labor regulation, first promulgated in 1996, relating to *employee* contributions to plans. That regulation provides that plan assets "include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant

has withheld from his wages by an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets ...." 29 C.F.R. § 2510.3-102(a). (Pls' Opp. at 13–14). Nowhere do defendants seek to reconcile the fact that the regulation quoted above expressly excludes union due remittances from the category of plan assets and their position that a conversion claim predicated upon the failure to make such remittances is preempted by ERISA.

 The Department of Labor's regulation compels a finding that a conversion claim for unremitted union dues is not preempted by ERISA. If union dues are not plan assets, and the regulation provides that they are not, then logically ERISA would not preempt a claim to recoup the same as it would not "relate to"—either by having a connection with or reference to—"any employee benefit plan." 29 U.S.C. § 1144(a). Indeed, the Second Circuit, based on the language in the above-cited regulation, held the same. *See LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2nd Cir.1997) ("To the extent that the Trustees' conversion claim is premised upon the failure of the Terwilligers to tender to the Union the withheld dues, however, ERISA does not preempt that particular claim. That is so because ... admittedly the Union dues were not 'plan assets' subject to ERISA[, citing 29 C.F.R. § 2510.3-102(a) ]"); *see also Eklec-Co v. Iron Workers Locals 40, 361, & 417 Union Sec. Funds*, 170 F.3d 353, 357 (2nd Cir.1999)("It is arguable that union dues fall outside the scope of ERISA" (citing *LoPresti* )).

 The next asserted problem with the conversion claim is one of standing. As defendants succinctly state: "Plaintiffs have incurred neither injury nor loss as a result of defendants' alleged acts.

Nor are plaintiffs authorized representatives of TMI's employees." (Defs' Reply at 11–12). Article III of the United States Constitution limits the jurisdiction of the federal courts to actual "cases" and "controversies." U.S. CONST. art. III, § 2. Key to whether an actual controversy exists is that there must be a palpable dispute between the plaintiff and the defendant. *See Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). In other words, the plaintiff must have a "personal stake in the outcome of the controversy." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Only by requiring that the plaintiff have a vested interest in the subject matter of the dispute can a court be assured that the parties will litigate the case with "the concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Id.* Having such a "personal stake" in the outcome of the suit has come to be known as possessing standing and is an aspect of Article Ill's case or controversy requirement. *See Flast v. Cohen,* 392 U.S. 83, 94–101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Defendants' principal argument for the Trustees lack of standing *vis-à-vis* the conversion claim is that neither the Trustees nor the Funds have suffered an injury, even assuming that defendants failed to remit the union dues as alleged in the complaint. According to defendants, any injury that was suffered by this act was to the unions themselves or their members, neither of whom are parties to this action and neither of whom the Trustees represent. To this the Trustees contend that, "[p]ursuant to the collective bargaining agreement, the defendants are required to remit Local Union # 345 supplemental working dues to the Local Trusts (who are the Local Union's collection agent) on a monthly basis." (Pls' Opp. at 14). The Trustees fail to point to where in the Master CBA such a provision is made, nor is there any reference to this alleged provision in their complaint. That having been said, from a review of the Master CBA attached to defendants' motion to dismiss, the Court has been able to find the section referred to by the Trustees. Section 8.2.1 provides that "[a]ny Employer covered by the provisions of this Agreement hereby agrees to deduct from the wages of any" covered employee, *i.e.,* union member, "District Council No. 16 Administrative Dues. The Employer will deduct the proper amounts in any given payroll period and will remit such sums to the … Trust Fund with [the] … Trust Fund monthly contribution reporting form …." (Defs' Mot. Dismiss, Ex. A at 14). As the alleged unremitted union dues were owing to the Trustees, as agents for the union, they have standing to recoup the same.

This then leaves the question of sufficiency of the sum sought for the Trustees' conversion claim. At the outset, the Trustees argue that it is "irrelevant that the monies … are not a specific identifiable thing." (Pls' Opp. at 15). In support of this proposition, the Trustees cite to New York state case law. As it is California and not New York law that controls in this case, such reliance is misplaced. Under California law, money cannot be the subject of a "conversion [action] unless a specific sum capable of identification is involved." *Haigler v. Donnelly,* 18 Cal.2d 674, 681, 117 P.2d 331 (1941). That said, "it is not necessary that each coin or bill be earmarked. When an agent is required to turn over to his principal a definite sum received by him on his principal's account, the remedy of conversion is proper." *Id.* Thus simply identifying how much has been converted by the other side is sufficient to survive a motion to dismiss. By way of example, in *Vu v. California*

*Commerce Club, Inc.,* 58 Cal.App.4th 229, 68 Cal.Rptr.2d 31 (1997), patrons of a gaming club sued the club and one of its employees for conversion to recover monies lost in card games, allegedly as result of defendants' cheating. The court held that the conversion claim was defective as it did not specify the sum allegedly stolen from the patrons. "The subject of these causes of action, and the damages alleged in them, once again were the funds plaintiffs lost. But neither by pleading nor responsive proof did plaintiffs identify any specific, identifiable sums that the club took from them. That rendered the generalized claim for money not actionable as conversion." *Id.* at 235, 68 Cal.Rptr.2d 31.

Here, the complaint nowhere identifies how much money defendants failed to remit for its employees union dues. Indeed, the complaint itself notes that the amount in unremitted union dues is "unknown." (Compl.¶ 60). This gap would normally suffice for dismissing the conversion claim. The Trustees argue that this gap is remedied by the fact that the formula for computing the amount of union dues owed is set forth in the Master CBA. (Pls' Opp. at 15). The problem with this argument is that without any of information on the variables (such as the number of covered employees that worked for defendants during the relevant time frame and/or the amount of hours those covered employees worked) to plug into the formula, the existence of the formula itself provides little guidance as to how much money was in fact converted.

Nonetheless, California courts have long recognized that there are limits to applying the specificity requirement when initially drafting a complaint. These limits are based on the practical consideration that oftentimes the drafter of the complaint is in an inferior position to plead such information:

"Faults consisting in ambiguities and uncertainties should be viewed, to a certain extent, in the light of the situation of the parties as to their knowledge of the facts; that is, as to facts of which the plaintiff cannot, from their nature, have as full information as the defendant. Less certainty is required in the allegations of the complaint, partly because a desirable degree of certainty may be impossible, and partly because the facts being known to the defendant he is not likely to be embarrassed or injured." The case here is one where the defendants practically constituted the managing body of the corporation, and must have had full knowledge of all the facts which they insist that plaintiffs must have alleged, though in no position to know or ascertain them.

*Harvey v. Meigs,* 17 Cal.App. 353, 365, 119 P. 941 (1911). It is this very point that the Trustees make in the complaint and in their pleadings, noting that "[d]ue to [TMI's] failure to allow the Trusts to complete an audit of its payroll and related records, the exact amount of fringe benefit contributions and/or contract damages due and owing have not been ascertained at this time." (Compl.¶ 17). Rather, than dismiss the conversion claim outright at this stage, the Court finds that leave to amend should be afforded to the Trustees to cure the defect.

Accordingly, defendants' Motion to Dismiss the conversion claim is **GRANTED** but with the Trustees' being granted **LEAVE TO AMEND** the complaint within 45 days setting forth, with specificity, the amount of union dues allegedly unremitted by defendants during the period in question.

### C. *Remaining Matters*

Finally, defendants argue that the Trustees have failed to exhaust the administra-

tive remedies mandated by the Master CBA before filing suit. (Defs' Mot. Dismiss at 1, 5–10). Defendants' argument is foreclosed by section 22.3 in the Master CBA, which clearly exempts the Trustees from having to comply with any of the grievance and arbitration procedures contained in the Master CBA before filing suit: "Notwithstanding the foregoing or any other provision of this Agreement, the [Trustees] of the Trust Funds shall have the power in their name or in the name of the Trust Funds or otherwise ... to demand and enforce, by suit in court or otherwise, in whatever form or forms they may choose, the prompt payment of contributions to the Funds including payments due to alleged delinquencies from signatory Employers or any other Employer, Company, or individual, without being limited or restricted by the grievance or arbitration procedures set forth or provided herein." (Decl. Patrick Leonard, Ex. A at 29). Even faced with this clear directive in the Master CBA exempting the Trustees from having to exhaust administrative remedies, defendants argue that what is self-evident to the average reader is not really the case. Defendants submit that the exemption creates an "ambiguity" because it conflicts with the mandatory grievance procedures elsewhere called for in the Master CBA. (Defs' Reply at 2). Such a "conflict" is not unremarkable as it simply denotes the effect any exception has on an otherwise mandatory rule: An indication that what normally must be done need not be done in a specific instance, in this case, the Trustees' pursuit of unpaid employer contributions in court.

Defendants further argue that the exemption's language is "unclear" as to what is meant by " 'grievance and arbitration' procedures" and that despite the all-encompassing scope of the exemption's language the Trustees "must still comply with other provisions of the [Master CBA], including other administrative notice re-quirements." (Defs' Reply at 2–3). These arguments are without merit. To begin with the obvious, the grievance and arbitration procedures referred to by section 22.3 are those contained in the Master CBA itself, the very ones defendants now argue that the Trustees should be held to. Second, the argument that a party must continue to comply with procedures even after being exempted from them strikes the Court as counter-intuitive. The administrative notice requirements referred to by defendants arise in the context of carrying out the grievance and arbitration proceedings that section 22.3 exempts the Trustees from having to participate.

■ Defendants lastly advanced a claim during oral argument that the exemption provided by section 22.3 does not allow for the Trustees to bring a conversion claim or seek liquidated damages as neither is concerned with the "payment of contributions." Defendants apparently failed to read the proviso preceding the language they have quoted: Section 22.3 expressly allows the Trustees to bring a suit "in whatever form or forms they may choose." This means that the Trustees are free to choose the type of claim or cause of action, and whatever damages flowing from the same they wish to pursue that is related to the payment of contributions, be they employee or employer contributions.

Finally, given that defendants' argument for the imposition of sanctions is wholly derivative of the Trustees persisting in the instant suit after being apprised of defendants' objections *vis-à-vis* exhaustion (Defs' Mot. Dismiss at 20), defendants' request for sanctions is **DENIED**.

### IV. CONCLUSION

Accordingly, defendants' motion to dismiss the conversion claim is **GRANTED** but with the Trustees' granted leave to

amend the complaint within 45 days from the entry of this Order. In all other respects, defendants' motion to dismiss is **DENIED**.

IT IS SO ORDERED.