Filed 6/26/13 Estate of Lowe CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| Estate of WAI YUNG LOWE, Deceased. | |
| EDMUND LOWE, as Special Administrator, etc.<br><br>    Petitioner and Respondent,<br><br>v.<br><br>FRANCISCO X. MARQUEZ,<br><br>    Objector and Appellant. | A134286<br><br>(San Mateo County<br>Super. Ct. No. PRO-116270) |
| EDMUND LOWE, as Special Administrator, etc.<br><br>    Plaintiff,<br><br>v.<br><br>JACK J. LOWE,<br><br>    Defendant. | (San Mateo County<br>Super. Ct. No. PRO-116794) |

Appellant Francisco X. Marquez appeals from the judgment after bench trial in which the probate court found he had converted over $400,000 in funds belonging to the Estate of Wai Young Lowe (the Estate), and had committed financial elder abuse against plaintiff Edmund Lowe. As part of the second amended judgment, the court also imposed a penalty under Probate Code section 859, and ordered appellant to pay Edmund's attorney fees and costs. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. *Factual Background and Pretrial Proceedings*

Edmund Lowe, Jack Lowe, and Bettina Cloud are the children of Henry D. Lowe (Father) and Wai Yung Lowe (Mother).[1] When this action was filed, all three children were over the age of 65 years old.

On January 24, 1995, Mother and Father executed a declaration of trust creating "The Wai Yung Lowe and Henry D. Lowe Revocable Living Trust" (the Trust), which Jack caused to be prepared. The Trust provides that if Father predeceased Mother, Father's interest in their primary residence would pass to her. On her death, it would pass to Jack.

On April 3, 1995, Mother executed a will (the April 1995 Will) providing that if Father predeceased her, all of her real property would go to Jack as part of the residue of her estate upon her death.[2]

Father died on August 28, 1995.

On October 23, 1995, Mother executed a new will (the October 1995 Will). The will provides that her entire estate shall pass to her three children equally, and that her real property, which consisted solely of her primary residence, would be sold upon her death with the proceeds to be divided equally among her children.

On November 24, 1995, Mother executed a revocation of the Trust (the Revocation). She also signed a written statement in which she revealed that she and Father were coerced by Jack into signing their wills in April 1995. She reported that they subsequently learned the April 1995 Will contained a clause making Jack the sole beneficiary as to their primary residence. In her statement, she affirmed that she had always wanted all of her property to be divided equally among her children.

---

[1] We use the first names of the three siblings throughout this opinion to avoid confusion. No disrespect is intended.

[2] Appellant, as Jack's attorney, never filed a petition to probate Mother's April 1995 will. He also never sought a judicial determination as to the validity of the Amended Trust under Probate Code section 17200, subdivision (a), which provides: "Except as provided in Section 15800, a trustee or beneficiary of a trust may petition the court under this chapter concerning the internal affairs of the trust or to determine the existence of the trust."

On May 16, 2003, Mother signed a document entitled "Amendment to the Wai Yung Lowe and Henry D. Lowe Revocable Living Trust" (the Amended Trust) which Jack asked appellant to prepare. The document provides that Mother's property is to be distributed to Jack's and his wife's personal living trust upon her death. Jack signed the Amended Trust as trustee.

Mother died on January 26, 2006.

On or about February 6, 2006, Jack retained appellant "to assist [him] with the administration of [Mother's] estate." Appellant represented Jack both individually and as the purported trustee of the Amended Trust.

On June 20, 2006, Edmund's attorney sent a letter to appellant, enclosing a copy of the October 1995 Will and the Revocation.

On July 17, 2006, Jack sold Mother's primary residence. The proceeds available for distribution after the sale amounted to $721,008. On July 25, 2006, appellant sent a letter to Edmund's counsel, challenging the validity of the October 1995 Will and the Revocation.

On March 27, 2007, Edmund filed a petition for probate of the October 1995 Will.[3]

On May 24, 2007, appellant, acting as Jack's attorney, filed a contest and opposition to probate of the October 1995 Will.

On August 22, 2007, Edmund filed a petition to determine the validity of the Amended Trust, along with a complaint against Jack for breach of fiduciary duty, fraud and misrepresentation, conversion, financial elder abuse, and constructive trust.

On April 17, 2009, Edmund filed an amended petition, adding appellant to the causes of action for fraud and misrepresentation, conversion, financial elder abuse, constructive trust, and accounting.

On May 14, 2009, Edmund was appointed special administrator of the Estate.

---

[3] The October 1995 Will was admitted to probate at trial. The probate court name Edmund as the estate administrator.

3

On June 23, 2009, the probate court filed an order requiring appellant to provide a detailed accounting as to three amounts, including the $721,008 received from the sale of Mother's home. The court also ordered the sum of $195,801 to be transferred to Edmund as special administrator of the Estate.

On July 13, 2009, appellant, on behalf of himself as well as Jack, filed a response to the accounting. The home sale proceeds were accounted for as follows: (1) $13,475 as reimbursement to Jack for repair expenses incurred to prepare the home for sale, (2) $194,877 in remaining Estate funds, (3) $419,595 in total payments "the estate has made to [appellant's] Law Firm for costs incurred and legal services rendered from June 22, 2006 through February 2, 2009," and (4) $93,059 in losses the Estate "suffered as a result of the financial crash in Fall 2008," and paid in early withdrawal penalties and administrative fees.

On July 29, 2009, Jack and appellant filed a motion for a determination that no conflict of interest existed such as to warrant appellant's disqualification from continuing to represent Jack.

On September 2, 2009, Edmund filed a motion for summary adjudication as to the cause of action in the amended petition alleging the invalidity of the Amended Trust.

On October 27, 2009, the probate court filed an amended order denying Jack's conflict of interest motion. The court disqualified appellant. The court also ordered appellant and his firm to return and refund the $419,000 in attorney fees and costs paid from the proceeds of the sale of Mother's former home.[4]

On February 8, 2010, this court dismissed the appeal filed as to the probate court's October 27, 2009 amended order. We granted Jack's and appellant's motion to treat the appeal as an extraordinary writ. We stayed the order with respect to appellant's disqualification only. As to the refund order, we stated: "The record before this Court amply supports the superior court's decision to require [appellant and his law firm] 'to return and refund all attorney's fees and costs received from the proceeds of the sale of

---

[4] Appellant's firm formally dissolved in October 2009.

4

the former home of [Mother] . . . to be placed in a blocked bank account . . . pending a final resolution of [the] case by the court, including a determination of fees owed for representation of [Mother]."

On March 12, 2010, the probate court issued an order again requiring appellant and his firm to refund the contested attorney fees and costs.

On May 21, 2010, the probate court issued its order granting Edmund's motion for summary adjudication, declaring the Amended Trust invalid. The court agreed with Edmund's position that the Amended Trust was void and invalid because the original Trust had been revoked by Mother in November 1995.

On October 19, 2010, the probate court granted Edmund new letters of special administration, authorizing him to administer the Estate under the Independent Administration of Estates Act.

On March 21, 2011, Jack and Edmund settled their dispute and Jack was dismissed from this litigation. As part of the settlement, the remaining estate funds of $194,877 were distributed to Jack, Edmund, and Bettina.

On July 15, 2011, the probate court granted Edmund's petition for an order directing transfer of property to the estate. The court again ordered appellant and his firm to pay $419,595 to Edmund as special administrator of the Estate. The matter proceeded to trial against appellant.

## II. The Trial

### A. Edmund Lowe

Edmund testified the proceeds of the sale of Mother's home were never turned over to him in his capacity as the special administrator of the Estate. He did not know anything about a new trust, a new will, or the revocation of any former trust until his sister sent the relevant documents to him several months after Mother's death.

### B. Jack Lowe

Jack testified that he asked appellant to revise his living trust in 2003 because he was about to undergo a serious operation and he was not sure he was going to survive. He wanted to make sure that his mother was taken care of in the event of his death. At

5

that time he also asked appellant to review Mother's existing will and trust because he had concerns about Edmund's role as co-trustee. His concerns were based on his brother's past financial difficulties, and the fact that Edmund had asked Mother for a loan on the equity of her house. He didn't feel comfortable with the idea that Edmund would take over Mother's finances if something happened to him.

When Jack was preparing to sell Mother's house in 2006, Bettina told him to contact Edmund. He sent a note to Edmund, telling him that appellant would be handling the matter. Edmund took the letter "the wrong way" and hired an attorney, leading to this lawsuit. After the house was sold, appellant advised Jack that none of the proceeds should pass through Jack's hands. Appellant said the money should be put into a lawyer's trust account. He told him such an account would not draw interest. He advised Jack to set aside one-third of the net proceeds to cover Edmund's potential claim. Jack agreed to do this and the money was left with appellant. Jack put the balance of the sales proceeds into two separate Wells Fargo Bank accounts, which he did not touch until he started receiving bills from appellant.

As the litigation dragged on, Jack authorized appellant to start applying the money set aside for Edmund towards his own legal fees. After this account was depleted, Jack transferred more funds to appellant from the two Wells Fargo accounts.[5] The parties had two mediations, and there were many conferences with opposing counsel. During that time, Jack always took appellant's advice. Appellant advised him not to settle, but did not justify the advice by saying he wanted to bill more to this case. Jack recalled appellant telling him not to settle if he felt uncomfortable. The probate court froze the remaining accounts in February 2009. After that, appellant continued to represent Jack without getting paid.[6]

---

[5] During the trial, the probate court agreed not to draw any inference with regard to any improper or excessive billing by appellant.

[6] Appellant represented that he has spent time on the case that would have justified billing of an additional $179,000.

Jack testified appellant never told him that he was no longer a trustee because Mother had revoked the Trust. He also did not tell Jack that the proceeds from the sale of her home should have been transferred to the Estate. If Jack had known that he potentially could have been held liable to pay the money back to the Estate, he would not have used the funds set aside for Edmund to pay appellant's attorney fees.

## C. *Appellant*

Appellant has been an attorney since 1994. In 2003, he drafted a trust for Jack. In February 2006, Jack asked for his help following Mother's death. At that time, appellant knew Mother had two other children besides Jack. He acknowledged receiving a letter from Edmund's attorney in June 2006, which was a month before Mother's home was sold. The letter included copies of the 1995 Revocation and the October 1995 Will.

When Mother's home was sold, the proceeds from the sale were transferred from the title company directly to appellant's firm's operating account. The money was not placed in a client trust account, or any other trust account. Appellant was aware of the State Bar Rules of Professional Conduct, rule 4-100, which requires attorneys to place client funds in accounts designated as client trust accounts. Jack told appellant to retain one-third of the sale proceeds for his brother, but he also instructed him not to disburse the funds to Edmund. Appellant testified that Jack transferred $220,390 to him to hold for Edmund's potential share of the Estate. The funds were to be held pending Jack's settlement offer. When the matter went to mediation, Jack refused to settle. After Edmund filed his petition and complaint in August 2007, Jack authorized appellant to apply the funds that had been set aside for Edmund to cover appellant's bills. Eventually that money was exhausted, and Jack transferred more money to the firm's operating account.

Appellant admitted he never put any of the funds he received from the proceeds of Mother's home into a client trust account. He claimed he did not do so because his client (Jack) specifically instructed him not to. Over the course of three years, his firm received over $419,000 in fees in this case. He acknowledged this amount represents over half of the proceeds from the sale of Mother's home. He never sent Jack monthly bills telling

7

him how much time he was spending on the case and how much money Jack would have to pay. Appellant acknowledged that the probate court had issued two orders for him to return the legal fees back to the Estate. Appellant did not comply with these orders because he did not have the money.

### III. *The Probate Court's Decision*

On August 24, 2011, the probate court rendered judgment in favor of Edmund as to the ownership of the sale proceeds, his claim for conversion, and his claim for financial elder abuse. The court found the claims had been proved by clear and convincing evidence. In the court's first amended judgment damages were awarded in the sum of $419,595, plus a statutory double penalty pursuant to Probate Code section 859 in the sum of $839,190. The judgment includes $214,280 in prejudgment interest.

On December 28, 2011, the probate court entered a written order denying appellant's posttrial motion to set aside the judgment or, alternatively, for a new trial, and entered a second amended judgment.[7] This appeal followed.

## DISCUSSION

### I. *Standards of Review*

We conduct a substantial evidence review of the probate court's factual findings: " 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' [Citation.] 'Under the substantial evidence standard of review, our review begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the trial court's factual determinations. . . . Substantial evidence is evidence of ponderable legal significance, reasonable in nature, credible, and of solid value. . . .' [Citation.]" (*Monks v. City of Rancho Palos Verdes* (2008) 167 Cal.App.4th 263, 295.) Otherwise, we review de novo questions of law and the application of law to the facts. (*Id.,* citing *Ali v. City of Los Angeles* (1999)

---

[7] The second amended judgment includes an additional award of $419,595 pursuant to Probate Code section 859. Edmund was also awarded $597,494 in attorney fees, along with costs in the sum of $36,508.

77 Cal.App.4th 246, 250; *Gagan v. Gouyd* (1999) 73 Cal.App.4th 835, 839, disapproved on other grounds in *Mejia v. Reed* (2003) 31 Cal.4th 657, 669, fn. 2.)

"On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." (*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142.)

## II. Conversion

Appellant claims Edmund failed to prove the elements of his conversion claim. We disagree.

" 'Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the appellant's conversion by a wrongful act or disposition of property rights; and damages. It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use. [Citations.]' [Citation.] Money can be the subject of an action for conversion if a specific sum capable of identification is involved." (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 451–452.) Because conversion is a strict liability tort, questions of the appellant's good faith, lack of knowledge, motive, or intent are not relevant. (*Oakdale Village Group v. Fong* (1996) 43 Cal.App.4th 539, 544.)

Appellant first claims Edmund failed to prove that he owned or had an immediate right to possess a specific amount of money at the time the estate funds were disbursed. He argues that Edmund's claim to one-third of Mother's estate is a "generalized claim for money [that is ] not actionable as conversion."[8] In support of this argument, he cites to *Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229 (*Vu*), and *PCO, Inc. v.*

---

[8] As Edmund correctly observes, appellant made no such objections at trial and the points may be deemed waived on appeal. (See *Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632.) In any event, the claims lack merit.

9

*Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, two cases that do not involve estates or probate proceedings. Thus, the cases are inapposite.[9] We also note that, in *PCO,* the court observed, "California cases permitting an action for conversion of money typically involve those who have misappropriated, commingled, or misapplied *specific funds held for the benefit of others.*" (*PCO, supra,* at p. 396, italics added.)

Here, it is uncontroverted that Edmund is entitled to one-third of the Estate under the October 1995 Will. Appellant and Jack both testified that the converted funds were initially set aside to cover Edmund's prospective share. Thus, even appellant understood that Edmund had a potentially valid claim to an ascertainable portion of the sale proceeds. Apart from the legal formalities necessary to fully probate the will, the only reason why Edmund was not able to secure possession of the funds at the time Mother's home was sold was because Jack and appellant chose to deprive him of access to the money. Because the Trust had been revoked, neither Jack nor appellant had any right to use any of these funds. It is also undisputed that appellant exercised dominion over the entire amount by placing the funds in his firm's operating account. (See *Bernstein v. State Bar* (1972) 6 Cal.3d 909, 916–917 [conversion lies where an attorney deposits client funds into his operating account, even if he later returns the funds, or a portion of the funds, to the client].) Thus, even if appellant had not taken the funds, he would still have been liable for conversion.

---

[9] The plaintiffs in *Vu* were card players, who sought review of an order granting summary judgment in favor of a card playing facility and a manager. They contended that their substantial losses in card games were the result of the appellants' failure to prevent cheating. The appellate court determined the trial court properly granted summary judgment on the causes of action for conversion: "The subject of these causes of action, and the damages alleged in them, once again were the funds plaintiffs lost. But neither by pleading nor responsive proof did plaintiffs identify any specific, identifiable sums that the club took from them. That rendered the generalized claim for money not actionable as conversion. [Citation.] Indeed, the gist of plaintiffs' case was that much of the money they lost was taken by persons other than the club or its employees. Any amounts the club may have taken . . . also were not identified." (*Vu, supra,* 58 Cal.App.4th 229, 235.) The facts of that case are not analogous to the facts of the present case. Here, Edmund was able to identify the specific sum taken by appellant.

Further, appellant was obligated by professional ethics to maintain the integrity of the funds. California Rules of Court, rule 4-100(A) provides, in relevant part: "All funds received or held for the benefit of clients by a member or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable bank accounts labeled 'Trust Account,' 'Client's Funds Account' or words of similar import, maintained in the State of California . . . . No funds belonging to the member or the law firm shall be deposited therein or otherwise commingled therewith [apart from certain exceptions not relevant here]." An attorney also violates his or her ethical duties and may be liable for conversion where the attorney holding funds in trust for a third party, releases them at his client's instruction. (See *Miller v. Rau* (1963) 216 Cal.App.2d 68, 76 [attorney committed conversion where he released funds to his client that attorney held for non-client].) In any event, " 'It is well settled that an attorney may not unilaterally determine his own fee and withhold trust funds to satisfy it even though he may be entitled to reimbursement for his services.' [Citations.]" (*Murray v. State Bar* (1985) 40 Cal.3d 575, 584.)

Appellant also claims he did not commit a "wrongful act" when he did not hold the Estate funds in trust for Edmund because he did not owe Edmund a duty. Not so. As noted above, appellant was aware of the Revocation and the October 1995 will. As Jack's attorney and an officer of the court in this probate matter, and as the custodian of the sale proceeds, appellant owed a duty to the Estate, and, as such, to all the beneficiaries of the will, including Edmund. Our Supreme Court has held that " 'An attorney who accepts the responsibility of a fiduciary nature is held to the high standards of the legal profession whether or not he acts in his capacity of an attorney.' [Citations.] Whether or not the persons to whom he owes a fiduciary duty are clients, he must maintain proper books and records *and not commingle funds*." (*Ridge v. State Bar* (1989) 47 Cal.3d 952, 961, italics added.)

Appellant admitted Jack transferred one-third of the net proceeds of the sale to him to hold for Edmund's share of the Estate in the event Edmund prevailed on his claim. That the probate court had not finally adjudicated the status of the Amended Trust at the

11

time appellant accessed the funds is of no import as, by this time, he knew Edmund had a potentially valid claim under the October 1995 Will, and that the Trust apparently had been revoked. He thus knew, or should have known, that he had no right to apply the proceeds from the sale of Mother's home towards his fees, regardless of whether Jack purported to authorize his conduct.[10] In sum, substantial evidence supports the finding that appellant is liable for conversion.

### III. *Whether the Probate Court Violated Appellant's Due Process Rights*

Appellant claims the probate court violated his due process rights and exceeded its jurisdiction when it ordered him to reimburse the Estate for the money Jack spent on legal fees incurred in the trust contest litigation. In particular, he contests the propriety of the probate court's pretrial orders that had ordered him to disgorge these funds pending final resolution of this case at trial. In our view, now that the trial has occurred and judgment has been rendered, the interim disgorgement orders are essentially moot. As we have noted above, the probate court found appellant personally committed the tort of conversion when he placed the Estate funds in his firm's operating account and applied those funds to cover fees for services rendered to Jack. Thus, appellant's liability to Edmund and to the Estate is not based on Jack's conduct, but rather on his own wrongful acts.

Appellant also claims that requiring him to finance the trust litigation with his personal assets violates his right to due process. The simple answer to this argument is that he was under no compulsion to use the Estate's assets to pay his legal fees in the first place. He could have, and should have, placed the disputed funds in a separate client trust account and submitted billing statements to Jack, who, presumably, could have paid these bills from his own personal funds and later sought reimbursement from the probate

---

[10] Appellant claims he did not need prior court approval to accept the estate funds that Jack used to pay him. He relies primarily on an unpublished appellate court decision. Such cases are not citable as authority. (See Cal. Rules of Court, rule 8.1115(a).) We deem the argument waived. We also note appellant did not follow proper statutory procedures for obtaining court approval for his fees. (See, e.g., Prob. Code, §§ 10810, 10811.)

12

court.[11]  While we agree that the costs of litigation concerning a trust should, as a general rule, be paid out of the trust corpus itself, the fact remains that before appellant began applying the proceeds from the sale of Mother's home towards his fees, he was on notice that the Amended Trust was likely to be deemed invalid because it had been revoked.  In sum, we find no due process violation.

## IV.  *Financial Elder Abuse*

Appellant claims the Elder Abuse and Dependent Adult Civil Protection Act (the Elder Abuse Act) does not apply because Edmund has never been under appellant's "care or custody" as stated in Welfare and Institutions Code section 15657.  As Edmund correctly notes, this statute does not apply to financial elder abuse claims, which are governed instead by Welfare and Institutions Code section 15610.30.[12]  Our review of the

[11] In general, trustees should seek reimbursement for attorney fees: "Trustees should carefully document any request for reimbursement of attorney fees.  'While recordkeeping is important in all aspects of administration, it is imperative in trust litigation that records support the contention of the trustee and others that the trust should pay the disputed compensation and fees.' [Citation.]"  (*Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 268.)

[12] Welfare and Institutions Code section 15610.30 provides:

"(a) 'Financial abuse' of an elder or dependent adult occurs when a person or entity does any of the following:

"(1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

"(2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

"(3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 1575 of the Civil Code.

"(b) A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult.

"(c) For purposes of this section, a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, *or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult.*

"(d) For purposes of this section, 'representative' means a person or entity that is either of the following:

"(1) A conservator, trustee, or other representative of the estate of an elder or dependent adult.

"(2) An attorney-in-fact of an elder or dependent adult who acts within the authority of the power of attorney."  (Italics added.)

record finds substantial evidence to support the probate court's conclusion that appellant committed elder abuse as to Edmund. The claim of error fails.

## V. *Whether Jack Acted in Good Faith in Defending the Trust*

Appellant next claims that Jack was authorized to use estate funds to defend the Amended Trust against Edmund's claim that the trust was invalid. In evaluating this argument, we are mindful that "The underlying principle which guides the court in allowing costs and attorneys' fees incidental to litigation out of a trust estate is that such litigation is a benefit and a service to the trust." (*Dingwell v. Seymour* (1928) 91 Cal.App. 483, 513.)

We note that Jack never petitioned the probate court as the trustee for an order authorizing payment of attorney fees. Instead, appellant simply took the money out of the comingled account to pay himself over time. This case is thus distinguishable from *Estate of Duffill* (1922) 188 Cal. 536 and *Terry v. Conlan* (2005) 131 Cal.App.4th 1445, two cases upon which he relies. For example, in *Terry,* a beneficiary challenged the trial court's order permitting the trustee to use trust income to pay attorney fees incurred in the course of advocating for the positions taken by rival beneficiaries. (*Terry, supra,* at pp. 1461–1462.) Similarly, *Duffill* concerned a case in which the trustee entered into an agreement with attorneys " 'that their fees should be wholly contingent upon the preservation of the trust . . . , that it would be necessary that the court should fix and allow such fees as would be reasonable under all of the circumstances and that *any fee paid to them should be approved by the court.*' " (*Duffill, supra,* at p. 548, italics added.) As Edmund correctly notes, Jack did not actually pay funds to appellant. Instead, appellant merely credited as fees the money he had already converted when he placed the funds in his firm's operating account. In sum, we agree with the probate court that appellant's use of the Estate funds was entirely unauthorized.

## VI. *Whether the Probate Court Erred in Ruling the 2003 Trust Amendment Invalid*

Appellant asserts none of Edmund's claims would have any basis if the probate court had not erred in finding the Amended Trust invalid. As noted above, on May 21, 2010, the probate court granted Edmund's motion for summary judgment, finding that the

Trust had been revoked by operation of law on November 24, 2005, when Mother executed the Revocation. The court further found that the Amended Trust was invalid because an expressly revoked trust cannot be revived by amendment, and, even if it could be revived, there was no transfer of property to the trustee to effectively revive it.

As Edmund correctly notes, appellant does not have standing to appeal this order. The issue of whether a party has standing to appeal is a question of law. (*IBM Personal Pension Plan v. City and County of San Francisco* (2005) 131 Cal.App.4th 1291, 1299.) An appeal may be taken on an appealable order or judgment but only by those who have standing to appeal, which is jurisdictional. (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947.) "Standing to appeal is 'jurisdictional and therefore cannot be waived.' [Citation.]" (*Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 295.) Thus, if a party has no standing to appeal, this court has no jurisdiction to consider the appeal.

Under Code of Civil Procedure section 902, "Any party aggrieved may appeal . . . ." "One is considered 'aggrieved' whose rights or interests are injuriously affected by the judgment. [Citations.] Appellant's interest ' "*must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment*." ' [Citation.]" (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737, italics added.) Here, the legal finding that the Amended Trust is void and the Trust revoked has no effect on appellant, who was not named as a party to that part of this action. Appellant is not named in the Amended Trust. The document itself only pertains to the rights of Jack, Edmund, and Bettina, as it purports to determine the status of Mother's property as to her heirs. Further, Jack is no longer a party to this lawsuit and has not elected to challenge the contested order. Appellant's interest in the substance of the ruling is remote at best. Accordingly, he has no standing to raise the alleged error.

## VII. *Entitlement to Damages Under Probate Code Section 859*

Appellant claims the probate court erred in awarding Edmund double damages under former Probate Code section 859. Former section 859 provides: "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to the estate of a decedent, conservatee, minor, or trust, the person shall be

liable for twice the value of the property recovered by an action under this part. The remedy provided in this section shall be in addition to any other remedies available in law to a trustee, guardian or conservator, or personal representative or other successor in interest of a decedent."

Appellant argues Edmund failed to prove that he acted in bad faith when he was unable to comply with the probate court's disgorgement order because he did not have the personal assets to refund the money. In asserting error, he analogizes a finding of bad faith to a finding in favor of punitive damages, relying on *Adams v. Murakami* (1991) 54 Cal.3d 105. However, he cites no cases that have applied the principles of punitive damages law to penalties awarded under Probate Code section 859. We decline his invitation to apply *Adams* to this case. As he offers no other challenge to the probate court's ruling, we find no error.

In any event, substantial evidence supports the conclusions that appellant violated the Rules of Professional Conduct and committed financial abuse of an elder with respect to funds belonging to the Estate. These findings are sufficient to support a finding of bad faith under Probate Code section 859.[13]

## VIII. *Attorney Fees*

As noted above, the probate court awarded Edmund attorney fees of $597,494 and costs of $36,508, all of which the court found reasonable and necessary with respect to the claim brought under the Elder Abuse Act. Welfare and Institutions Code section 15657.5, subdivision (a), provides for an award of reasonable attorney fees and costs to victims of financial elder abuse where abuse is proven by a preponderance of the evidence. Appellant claims Edmund is entitled at most to reasonable attorney fees relating to the Elder Abuse Act claim only, and should not have been awarded fees incurred for work unrelated to that claim. He contends the probate court abused its

---

[13] We note Probate Code section 859 was amended after judgment was rendered in this case to add financial abuse of an elder as grounds for imposing the statutory penalty. (See Prob. Code, § 859, as amended by Stats. 2011, ch. 55, § 1, (Assem. Bill No. 354), effective Jan. 1, 2012.)

16

discretion by failing to properly apportion fees between that claim and the other causes of action asserted by Edmund.

"When a cause of action for which attorney fees are provided by statute is joined with other causes of action for which attorney fees are not permitted, the prevailing party may recover only on the statutory cause of action." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133.) However, the joinder of causes of action will not dilute the right to attorney fees that are incurred for representation of an issue that is common to both a cause of action for which fees are permitted and one for which they are not. (*Ibid.,* citing *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129–130.) Therefore, apportionment is not required where the various claims are so factually or legally intertwined as to make it impracticable to separate the attorney's time between those claims for which fees may be awarded and those for which they may not. (*Akins, supra,* at p. 1133; see also *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 687 ["Apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units"].)

Here, the factual basis for the conversion claim is identical to the basis for the financial elder abuse claim. Both claims concern appellant's misappropriation of the same funds.[14] Accordingly, we find the probate court did not abuse its discretion in awarding the attorney fees requested by Edmund.

---

[14] Appellant also claims Edmund is not entitled to recover legal fees for work performed before he was joined as a party to this action. He also asserts Edmund's attorneys contributed to the excessive fees and costs the parties incurred in this litigation. He does not cite to any legal authority in support of either of these claims. Accordingly, we deem the arguments waived. "An appellant must provide an argument and legal authority to support his contentions. This burden requires more than a mere assertion that the judgment is wrong. 'Issues do not have a life of their own: If they are not raised or supported by argument or citation to authority, [they are] . . . waived.' [Citation.] It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852; accord, *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799.)

## DISPOSITION

The second amended judgment is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P. J.

_____
Banke, J.

18